

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JAM:MKC
F. #2018R01256

610 Federal Plaza
Central Islip, New York 11722

January 2, 2019

<u>By Hand and ECF</u>

The Honorable Arthur D. Spatt
United States District Court
Eastern District of New York
Central Islip, New York 11722

   Re: <u>United States v. Larry Carpenter,</u>
     <u>Criminal Docket No. 18-CR-362 (S-2) (ADS)</u>

Dear Judge Spatt:

   Trial for matter is scheduled to commence on January 15, 2019. The government hereby moves <u>in limine</u> for preliminary findings as to the admissibility of evidence of (1) song lyrics and music videos that provide direct evidence of the defendant's narcotics trafficking and possession of the firearm recovered in this case and (2) the defendant's efforts to obstruct justice. The government also hereby requests limited protective orders relating to an undercover officer, confidential witnesses, and civilian witnesses.

BACKGROUND

   The defendant is charged by superseding indictment with conspiring to distribute heroin and cocaine base between September 2015 and June 2018 ("Count One"), using a firearm in furtherance of the same, as well as in furtherance of the sale of cocaine base and heroin on June 24, 2018 ("Count Two"), and being a felon in possession of a firearm ("Count Three"). The charges stem from the defendant's June 24, 2018 sale of cocaine base and heroin to two individuals, including a law enforcement operative. The defendant carried out the sales while seated in the passenger seat of a vehicle. When the defendant was subsequently detained, a .38 caliber revolver and two cellular devices—one LG phone ("Device 1") and one iPhone ("Device 2") were recovered from the passenger seat where the defendant had been seated.

MOTIONS IN LIMINE

I.  Admissibility of Defendant's Other Acts and Admissions Pursuant to FRE 404(b)

   A.  Relevant Portions of the Defendant's Music Videos and Song Lyrics are Admissible at Trial

   The government anticipates offering in its case-in-chief certain video evidence—including, at minimum, an interview of the defendant and two music videos—as well as various song lyrics recovered from searches of Device 2.  As set forth more fully below, these items are admissible as party admissions and direct evidence of the alleged crimes.  The government hereby moves in limine for a preliminary finding with respect to the admissibility of items within these categories.  A representative sample of such exhibits are enclosed by CD for the Court's consideration and outlined below.  The government reserves, however, the right to introduce additional music videos or song lyrics as they may become relevant at trial.

   1.  Summary of Proposed Song Lyrics

   The below outlines certain relevant excerpts of a sampling of the defendant's rap lyrics.  The enclosed CD contains the full notes from which the below is excerpted.

- "I got my revolver…my pistol in the party…she gone hold the drugs while she drive and I gotta weapon she m I don't trust her reckless so I still keep a weapon"

- "I keep a gun on me you smell it before you e know them drugs up on me"

- "Im tronna make a million in 50s don't call me less than a 50…Drugby he stackin and flipping Richie be back to the drippin giff he just mastered the kitchen Menace he map out the business Im out in traffic Wit bitches they got me feelin like pretty tone im flooding long Money full a coke whole time i was under smokes this before we was sellin dope it was trap houses cookin coke sk by the back door blast on em if he act tough my rags bloddy when we mask up. . . I was staying true to the trap with a strap and my broads car"

- "fuckin up them roads i been takin fetinol and mixing it wit dope . . . takin some trash Shit and turn it to some gold talkin mixing. . . II fuck wit them trap phones TJ Wit me he been down to hit them"

- "I'm still trapping cuz I gota feed my baby wit all these felonies I know they wanna cage me somebody save me from problems and these bitches bitches who get hyped up over comments tired running wit this 38 revolver"

- "I bought the gang wit me when we in the spot we get it poppin and we drinkin straight henny and we talkin big money if you niggaz get funny know all of

2

strapped . . . I'm true to the trap I boom wit the jack I move wit the strap my shooters in back . . . my plug is Haitians a whole lot gang . . . Fresh off the boat so the coke is fishy I gotta Mac and it's holding 50 I got the drip while they holding Richie I got ya bitch wit me rollin piffy I bought that bitch a new ass and titties she hold the Glizzy in traffic wit me she hold the dope in between her titties I got some fire to flood the city I'm back to the juggin I'm back to the cookin I'm plotting on everything comin up I'm back in the Kitchen I'm back on my strip and I'm busting down everything running up im mr back road runner nigga and my trap phone dumbing nigga every call for a hunnit nigga"

- "every Bobby needs Whitney . . . I got fire in my trunk and it's just me and my baby I been trappin out this Honda now I need a Mercedes's 100 grams this shit booming she been driving all night she used to dance up in trap house she know bout them long nights she know bout that raw white I go buy us off . . . I'm strapped up I got my trap phone it's just me and my bitch we in traffic we been trappin l . . .lotta drugs a lot of money is the conversations she bring the grippy in spots"

- " I gotta dirty Mac 11 and the homie gotta rusty 38"

- "keep dog food keep Kane wit EM trap boomin all this money Comin like it came wit it Glock 40 and this 30 clip like it came wit it . . . always got a couple hatz wit me know . . . A few of my niggaz is locked in the Feds still gettin that bread . . . Tell Grafh that the traps phones keep ring ringing stay road running"

- "Nigga don't get in my way I'm just addicted to cake first I'mma take over blocks then imma take over states imma keep callin the plays i make it fall into place I used to hustle the strip I used to run around gripped imma still run around gripped I could still shoot from the hip. . . Wait Nigga don't get in my way Rugby he gripping the Glock I run around wit the k I been addicted to pots I'm into whippin that yay I'm into coming to cities fuckin it up for the cake flooding that shit . . . Me and my niggaz they callin us drop Boyz we playin wit birds we trappin in drops boy we been in the streets playin wit coke boy now we French and he brought the coke BOYZ I'm been that Nigga themy niggaz they still got the block runnin around wit that Cake"

- "ain't no problem no shells I'm using revolvers. . . I'm running these streets getting cocaine money nigga I got shooters every hood I get stupid wit this trap shit bust moves in every hood nigga get crazy this 380 gone chew into Check my block all we do is pop all we push is drop"

- "First thing in morning I'm just thinkin chicken hop up out the bed and Im straight to the kitchen. . . I see only profit whether I drop or throw this this weight around I keep this 38 around . . . Gone move wit Strike hop up in the

3

whip. Fill it wit bricks And we gone move tonight . . . Whip brick of Come back mix that wit soda"

2. <u>Summary of Proposed Videos</u>

- "Tee-Talk Interview:" In this video the defendant discusses his music with an interviewer. Therein, he specifically claims that the authenticity of his music by proclaiming that what makes him different than other artists in Long Island is "authenticity, that's number one. A lot of things I'm talking about—every single thing I'm talking about, I've been through it. I did it, I seen it with my own eyes. Not some stories that I heard, or a nigga that I knew. I'm a part of it and I've been through it."

- "Young Bonnie Video:" In this video the defendant appears driving around in a vehicle with a female passenger. Throughout, both carry a firearm and the defendant raps about his drug business.

- "Might Not Make it Home Video:" In this video, the defendant appears brandishing what the government submits is the precise firearm recovered in connection with defendant's arrest and referenced in Count Three of the Indictment.

3. <u>Discussion</u>

As a threshold matter, the lyrics and videos are not excludable as hearsay. Both are comprised of the defendant's statements, which are not hearsay under Fed. R. Evid. 801(d)(2)(A) and are admissible against the defendant. Fed. R. Evid. 801(a) defines a "statement" as including a person's oral and written statements. <u>See also</u> <u>United States v. Dore</u>, 2013 U.S. Dist. LEXIS 110621, at *23-25 (S.D.N.Y. July 31, 2013) ("The music video featuring [the defendant] might also be admissible as a 'statement' made by and then offered against an opposing party"); <u>see also</u> <u>United States v. Foster</u>, 939 F.2d 445, 455 n.13 (7th Cir. 1991) (noting that rap lyrics written by defendant into his notebook, which were admissible under Rule 404(b), also 'could have [been] categorized . . . as an admission by a party opponent'"). To the extent any of the videos contain statements from third parties to this case, those statements are admissible to provide context for the defendant's comments. <u>See</u> <u>United States v. Dupre</u>, 462 F.3d 131, 137 (2d Cir. 2006).

Moreover, the lyrics are relevant as direct evidence of the charged crimes. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Second Circuit has held that "[r]ap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." <u>United States v. Pierce</u>, 785 F.3d 832, 841 (2d Cir.), cert. denied, 136 S. Ct. 172, 193 L. Ed. 2d 139 (2015). Further, "[f]ederal courts across the country, including those in this circuit, have found rap lyrics or videos to be

4

relevant evidence in criminal trials based on the content of the evidence and the issues in the case."

Here, for example, the song lyrics and music videos are direct evidence that the drug trafficking conspiracy charged in Count One existed and involved the defendant. The lyrics, inter alia, refer to individuals involved in drug trafficking with the defendant, describe the defendant's processes for preparing and delivering the drugs he distributed, and show the defendant's knowledge of the drug trade and certain drug code words like "dog food" and "hard." This is plainly relevant to the crimes charged. See United States v. Wilson, 493 F. Supp. 2d 460, 463 (E.D.N.Y. 2006) (in racketeering case, lyrics describing illegal activities of a group of individuals was relevant to determining whether said group existed and was an enterprise engaging in racketeering activity); United States v. Jones, No. 05-CR-322 (NAM), 2007 U.S. Dist. LEXIS 34772, (N.D.N.Y. May 11, 2007) aff'd sub nom. United States v. Applins, 637 F.3d 59 (2d Cir. 2011) (defendant's rap lyrics relevant where they showed his knowledge of the gang alleged to be responsible for the racketeering activity); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) (a "legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal enterprise developed; this sort of proof furnishes admissible background information in a conspiracy case"); United States v. Foster, 939 F.2d 445, 456 (7th Cir. 1991) (defendant's rap lyrics relevant where he was charged with possession of narcotics with intent to distribute and lyrics demonstrated his knowledge of the drug trade and certain drug code words). Further, the lyrics make reference to the standard minimum quantities the defendant insisted upon when selling drugs. These references, in addition to corroborating relevant witness testimony on this point, go directly to the question of the weight of narcotics sold over the course of the conspiracy, which the jury will have to decide.

Likewise, ceratin song lyrics include repeated references to the defendant being "strapped," "gripped," or carrying a "hammer" during the course of his drug distribution efforts. These lyrics are thus direct evidence of Count Two, which charges the defendant with possessing, using, and carrying firearms in furtherance of drug trafficking crimes. Along the same lines, the enclosed "Young Bonnie" video depicts the defendant carrying a firearm. This video is relevant, among other things, for the purpose of demonstrating the defendant's access to firearms. Moreover, the content of the song addresses the defendant's distribution of narcotics and reliance on co-conspirators for the same and so is relevant to proving a drug conspiracy. United States v. Rivera, No. 13-CR-149(KAM), 2015 U.S. Dist. LEXIS 50979, at *22 (E.D.N.Y. Apr. 17, 2015) ("excerpts of videos depicting the defendants with firearms, cash and drugs are highly probative to the weapons-related charges, narcotics trafficking charges and money laundering charges").

The defendant's song lyrics even make specific references to a .38 revolver, the precise model of the firearm identified in Count 3, which charges the defendant with being a felon in possession of a firearm. Such references are highly probative. See United States v. Wilson, 493 F. Supp. 2d 484, 488-89 (E.D.N.Y. 2006) (defendant's rap lyrics relevant where they described activity that resembled aspects of the crime alleged); United States v. Stuckey, 253 F. App'x 468, 482 (6th Cir. 2007) (defendant's rap lyrics relevant where they described shooting and disposal of bodies in a manner that mirrored the charged

5

crime). Indeed, one of the videos enclosed herein, the "Might Not Make it Home Video," depicts the defendant brandishing what the government submits is the very .38 revolver recovered on the night of the defendant's arrest. Accordingly, the video is relevant as direct evidence of the charged crime. See United States v. Dore, 2013 U.S. Dist. LEXIS 110621, at *22 (S.D.N.Y. July 31, 2013) (music video relevant where it depicted guns that appeared to be "just like" the guns used in the charged robberies and a Mercedes Benz that testimony would assert was the same car used to facilitate certain of the charged robberies).

      Moreover, the probative value of the lyrics is heightened by the fact that they contain significant indicia of reliability, including specific references to the defendant's methods for preparing narcotics. For example, the defendant specifies in certain song lyrics that he prepares heroin by mixing it with fentanyl. The lab report of the heroin recovered in this case indeed demonstrates that it was diluted with at least two fentanyl analogs. The lyrics are also relevant as corroboration for witness testimony regarding the manner in which the defendant carried out his business. For example, the government anticipates that multiple witnesses will testify that the defendant worked with a female to aid him in delivering narcotics, including by driving the defendant to drug deals, taking orders over the defendant's cell phone and carrying out deliveries on his behalf when he was unavailable. A recurring theme of the defendant's lyrics is a female that aids him in preparing and delivering narcotics, as well as helping him manage his "trap" phone. The foregoing is highly relevant to the defendant's involvement in a drug trafficking conspiracy. See United States v. Scott, 677 F.3d 72 (2012) (observing that, in context of "other acts" evidence under Rule 404(b), Second Circuit has "consistently held" such evidence "admissible to corroborate crucial prosecution testimony"); United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (same). Additional indicia of reliability is found in the enclosed "Tee-Talk Interview." There the defendant asserts the authenticity of his rap lyrics and maintains that the music he writes depicts his actual life. These statements are relevant to establishing the reliability of the lyrics the government will introduce at trial.

      While the videos and lyrics contain profanity and other language to which observers might object, the probative value of this evidence far outweighs any potential prejudice to which it may give rise. See United States v. Rivera, No. 13-CR-149(KAM), 2015 U.S. Dist. LEXIS 50979, at *22 (E.D.N.Y. Apr. 17, 2015) (probative value of video excerpts depicting guns and drug in a case charging narcotics trafficking and weapons charges outweighed the risk of unfair prejudice under Rule 403 and, therefore, were admissible). Indeed, "[I]n this circuit, evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s]'" United States v. Herron, No. 10-CR-0615 (NGG), 2014 U.S. Dist. LEXIS 63872, at *13-14 (E.D.N.Y. May 8, 2014) (quoting United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999)); see also United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (noting that the challenged evidence did not involve conduct "any more sensational or disturbing" than the charged crimes"). In Herron, the Court acknowledged that the challenged "videos contain profanity, misogyny, and references to violence that viewers could find objectionable or shocking" but concluded that "it cannot be said that their content is :more inflammatory than the charged crimes—three violent murders, narcotics trafficking, weapons possession, and other criminal activity by the

6

alleged enterprise"). Id. at *14. In any event, the government is not opposed to an appropriate limiting instruction advising the jury as to how these lyrics and videos can be taken into consideration during their deliberations.

      B.      <u>The Defendant's Efforts to Obstruct Justice are Admissible at Trial</u>

At trial, the government will introduce evidence in the form of emails and jail calls that demonstrate the defendant's efforts to obstruct justice by, among other things, instructing his associates to perform a remote wipe of Device 2 and delete a music video that depicts the defendant brandishing the firearm at issue in this case. All of these statements are highly relevant and admissible as admissions of a party opponent. Fed. R. Evid. 801(d)(2)(A).

The Second Circuit has adopted an "inclusionary approach" to Rule 404(b) evidence and allows evidence to be received at trial "for any purpose other than to attempt to demonstrate the defendant's criminal propensity." <u>United States v. Edwards</u>, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation omitted). "Evidence of consciousness of guilt is admissible if the Court: (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." <u>United States v. Perez</u>, 387 F.3d 201, 209 (2d Cir. 2004).

The Second Circuit has repeatedly held that "evidence of obstructive conduct is admissible to show consciousness of guilt." <u>See</u>, e.g., <u>United States v. Triumph Capital Group, Inc.</u>, 544 F.3d 149, 160 (2d Cir. 2008) ("[Defendant's] efforts to obstruct the investigation evidence a consciousness of guilt that further supports the jury's verdicts."); <u>United States v. Malpiedi</u>, 62 F.3d 465, 467 (2d Cir. 1995) ("This testimony was direct evidence of [defendant's] obstruction of justice and of his consciousness of guilt of the other charges); <u>United States v. Robinson</u>, 635 F.2d 981, 986 (2d Cir. 1980) ("This evidence [of obstruction] was also admissible as evidence of the appellants' consciousness of guilt."). So too should the evidence of obstructive conduct be admissible here.

II.     <u>Protective Orders</u>

      A.     <u>The Court Should Protect the Identities of an Undercover Officer and Confidential Witness from Disclosure</u>

At trial, the government expects to call an undercover detective ("UC101") of the Suffolk County Police Department ("SCPD") and a Confidential Witness ("CI 11-12") working with the Nassau County Police Department ("NCPD") whose true identities are not known to the defendant (collectively, the "Confidential Witnesses" or "CWs"). Both UC 101 and CI 11-12 are actively participating in a covert capacity in law enforcement investigations.

7

UC101 is expected to testify, among other things, about his observation of the two narcotics transactions the defendant carried out on June 24, 2018. UC101 is currently acting as an undercover officer in SCPD investigations involving narcotics transactions throughout Long Island. As such, public disclosure of UC101's identity could jeopardize the integrity of these ongoing investigations and UC101's physical safety.

CI 11-12 is expected to testify regarding her controlled purchase of heroin from the defendant on June 24, 2018. Although CI 11-12 is a civilian, she is differently situated than other confidential informants in that she has no criminal history or prior involvement with narcotics distribution. Her only involvement in such dealings has been in connection with her work as a confidential informant for the Nassau County Police Department ("NCPD"). Indeed, CI 11-12, is still currently involved in performing controlled purchases of narcotics on behalf of the NCPD. As such, her true identity is not known to members of the drug trafficking community and disclosure in connection with this case would jeopardize both her safety and any ongoing investigations she is involved in. Concerns for her safety are arguably graver than those with respect to UC101, as CI 11-12 is not a trained officer of the law and therefore less-equipped to defend herself against any reprisal for her testimony in this trial.

Concern for the safety of the Confidential Witnesses is particularly compelling given the nature of the case and the defendant's history and characteristics. The defendant is associated with known members of the Bloods gang, and has serious prior convictions, including assault, menacing and gun offenses. Given that the Bloods street gang is a violent criminal organization that has committed murder, assault and threatened members and associates believed to be cooperating with law enforcement authorities. As such, the government submits that the proposed protective order, attached hereto as Exhibit A, is a necessary precaution.

First, the government requests a protective order permitting the government to disclose the CWs' true identities to defense counsel for the limited purpose of preparing for trial. We further request that defense counsel, including any defense investigator or paralegal employed by counsel, be ordered not to disclose the CWs' identity to the defendant or any third parties. This will allow the defense to investigate the CWs' background, but protect the CWs' names from disclosure to the defendant or to the public. The government has discovered no Brady or Giglio material with respect to the CWs.

Second, the government requests that the CWs be permitted to testify at trial using their respective numerical identifiers.

Third, the government requests that the defendant be precluded from cross-examining the CWs about any topics related to the CWs' true identities and/or the CWs' current and past investigations unrelated to the offenses charged in this case. In this regard, the government represents that, aside from the instant matter, the UCs are not currently engaged in any ongoing investigations involving the defendant.

8

The government respectfully submits that these proposals ensure a fair trial to the defendant while simultaneously protecting the safety of the CWs and the integrity of their ongoing investigations. The Second Circuit has long approved limitations on cross-examination designed to protect witnesses' safety. See United States v. Watson, 599 F.2d 1149, 1157 (2d Cir. 1979) (upholding limitation of cross-examination to permit witness enrolled in Witness Protection Program "to maintain his concealed identity," including barring questions concerning "his employment, whether he was supporting his family, [and] the price of his automobile"); United States v. Cavallaro, 553 F.2d 300, 304 (2d Cir. 1977) (upholding barring questions concerning kidnapping victim's current address). Such limitations are appropriate when "the government voices a legitimate concern for a witness' safety." Cavallaro, 553 F.2d at 304-05.

Withholding the CWs' identity from the defendant does not violate his rights under the Sixth Amendment's Confrontation Clause. See United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970) (prosecution's offer to provide witness's address to defense counsel privately satisfies confrontation rights and does not prejudice cross-examination); United States v. Abu Marzook, 412 F. Supp. 2d 913, 923 (N.D. Ill. 2006) (rejecting Confrontation Clause challenge to permitting government to withhold true names of witnesses whose identities were classified and permitting those witnesses to testify under pseudonyms). Moreover, the defendant "will be able to physically face" the CWs and cross-examine them based on their testimony or any other proper basis. See id.

The government seeks only a narrow limitation of cross-examination on matters that might reveal the CWs' identities and the nature of any ongoing investigations unrelated to the defendant. Further, the use of a numerical identifier rather than the CWs' true names will not deprive the defendant of the ability to confront the CWs' testimony, nor would it deprive the Court of the ability to evaluate the CWs' demeanor.

In a different context, the Supreme Court has held such limitations invalid. See Smith v. Illinois, 390 U.S. 129, 130-31, 133 (1968); Alford v. United States, 282 U.S. 687-88, 692-93 (1931). In particular, the court in Smith found that "identifying the witness with his environment" was fundamental to the right of cross-examination. Smith, 390 U.S. at 132. While the answer to the question, "Where do you live?" may have some bearing in a case involving an ongoing relationship between an informant and a defendant, that concern has no bearing in this scenario where the CWs had no other contact with the defendant other than in connection with events surrounding his June 24, 2018 arrest. Similarly, in Alford, defense counsel sought to cross-examine a witness concerning his address because counsel believed the witness was in federal custody, and thus his testimony might be biased or coerced. Alford, 282 U.S. at 693. That concern is irrelevant here.

Given that the government continues to comply with the requirements of Brady v. Maryland, 373 U.S. 83 (1963), including providing any information or material within the scope of Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959), with respect to all of its witnesses, including the CWs, the defendant's case and his ability to mount an effective cross-examination will suffer no prejudice whatsoever. The

9

government requests that the Court grant this motion and issue the proposed order attached hereto as Exhibit A.

      B.      <u>The Court Should Grant a Protective Order with Respect to Exhibits, 3500 Material and Giglio Material relating to Civilian Witnesses</u>

The government also requests that the Court execute a protective order regarding the exhibits, 18 U.S.C. § 3500 and <u>Giglio</u> materials with respect to civilian witnesses (the "Civilian Witness Material") to be provided for the upcoming trial. Specifically, the government hereby moves the Court to issue a protective order directing that defense counsel, or anyone acting under the direction of defense counsel, not reproduce, distribute or otherwise disseminate the Civilian Witness Material to be provided for the upcoming trial of the defendant, and that the defendant not be permitted to bring the Civilian Witness Material back to the institution where he is incarcerated.

The Civilian Witness Material in this case will reveal, <u>inter alia</u>, the identity of witnesses that have cooperated with law enforcement authorities, including CI 11-12. Moreover, the Civilian Witness Material will include a copy of two cellular devices that were obtained by law enforcement on the consent of witnesses. These materials contain personal identifying information of civilian witnesses, as well as their family and friends. As outlined, <u>supra</u>, there defendant's history and characteristics and the nature of this case raise concerns for the safety of testifying witnesses. Any inappropriate disclosure of the Civilian Witness Material in this case will endanger the safety of government witnesses and their families. Accordingly, the government submits a proposed protective order, attached hereto as Exhibit B for the Court's consideration.

<u>Conclusion</u>

Based on the foregoing, the government respectfully requests that the Court find that the defendant's song lyrics, music videos and obstructive efforts are admissible at

trial. The government also requests that the Court order the protective orders attached hereto as Exhibits A and B.

                                                Respectfully submitted,

                                                RICHARD P. DONOGHUE
                                                United States Attorney

By:   /s/ Monica K. Castro
       Monica K. Castro
       Assistant U.S. Attorney
       (631) 715-7894

Encl.
cc:    Clerk of the Court (ADS) (By Hand and ECF)
        Defense counsel (By Email and ECF)